BETSY C. MANIFOLD (182450)
*manifold@whafh.com*
RACHELE R. BYRD (190634)
*byrd@whafh.com*
ALEX J. TRAMONTANO (276666)
*tramontano@whafh.com*
**WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA HORROBIN, Derivatively on Behalf of Nominal Defendant FATE THERAPEUTICS, INC., | Case No. **'24CV1027 AJB MSB** |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| SCOTT WOLCHKO, SHEFALI AGARWAL, TIMOTHY P. COUGHLIN, ROBERT S. EPSTEIN, ROBERT HERSHBERG, KARIN JOOSS, MICHAEL LEE, JOHN MENDLEIN, WILLIAM RASTETTER, YUAN XU, and EDWARD J. DULAC III, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FATE THERAPEUTICS, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Angela Horrobin ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Fate Therapeutics, Inc. ("Fate" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Fate, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Hadian v. Fate Therapeutics, Inc., et al.,* Case No. 3:23-cv-00111-RBM-AHG (S.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Fate against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least April 2, 2020 and January 5, 2023, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2. Fate is a biopharmaceutical company based in California that develops cellular immunotherapies for cancer and immune disorders.

3. On April 2, 2020, Fate announced that it had entered into a collaboration agreement (the "Collaboration Agreement") with Janssen Pharmaceuticals, a company owned by Johnson & Johnson ("Janssen"). Pursuant to the Collaboration Agreement, Fate would receive an upfront payment of $50 million and would be

eligible to receive up to $3 billion in milestone payments and royalties on net sales from the collaboration.

4. On January 5, 2023, Fate announced the termination of the Collaboration Agreement. Specifically, the Company stated that it was "not able to align with Janssen on their proposal for continuation of our collaboration, where two product candidates targeting high-value, clinically-validated hematology antigens were set to enter clinical development in 2023[.]" As a result of the termination, Fate further announced that it would be discontinuing several of its core cell therapy programs and would be significantly reducing its workforce.

5. On this news, the price of Fate's common stock declined 61.45%, from a closing price of $11.00 per share on January 5, 2023 to a closing price of $4.24 per share on January 6, 2023.

6. Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Fate was unable to replicate results it had achieved in its research and development phase in a clinical setting; (ii) as a result, the Company could not reasonably expect to earn several of the milestone payments and royalty payments covered by the Collaboration Agreement; and (iii) the Collaboration Agreement was, therefore, less beneficial to the Company than had been represented to the public.

7. As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

8. Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants

are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Fate is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

14.     Plaintiff is, and has been at all relevant times, a shareholder of Fate.

***Nominal Defendant***

15.    Nominal Defendant Fate is incorporated under the laws of Delaware with its principal executive offices located at 12278 Scripps Summit Drive, San Diego, California 92131. Fate's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "FATE."

***Individual Defendants***

16.    Defendant Scott Wolchko ("Wolchko") has served as Chief Executive Officer ("CEO") and President of Fate since December 2015 and as a director since October 2015. Defendant Wolchko additionally served as Fate's Chief Financial Officer ("CFO") from September 2007 until August 2020. Defendant Wolchko is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Wolchko received $8,145,000 in 2022 and $3,522,750 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Wolchko beneficially owned 2,003,245 shares of Fate common stock, constituting 1.73% of the Company's total outstanding shares and worth $14,182,974.[1] During the Relevant Period, Defendant Wolchko sold 634,375 shares of Company stock while in possession of material non-public information for proceeds of $45,849,544. While the price of Fate stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Wolchko made the following sales of Company stock:

- On November 12, 2020, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $53.18 per share, reaping $1,595,430 in proceeds.
- On November 13, 2020, Defendant Wolchko sold 30,000 shares of

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $7.08 per share closing price of Fate's stock on April 1, 2024.

personal holdings of Company stock at an average price of $51.03 per share, reaping $1,530,900 in proceeds.

- On December 17, 2020, Defendant Wolchko sold 20,000 shares of personal holdings of Company stock at an average price of $92.28 per share, reaping $1,845,660 in proceeds.

- On January 08, 2021, Defendant Wolchko sold 60,820 shares of personal holdings of Company stock at an average price of $116.33 per share, reaping $7,075,008 in proceeds.

- On January 11, 2021, Defendant Wolchko sold 8,587 shares of personal holdings of Company stock at an average price of $110.68 per share, reaping $950,374 in proceeds.

- On January 21, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $103.59 per share, reaping $3,107,850 in proceeds.

- On January 22, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $98.76 per share, reaping $2,962,830 in proceeds.

- On February 18, 2021, Defendant Wolchko sold 20,000 shares of personal holdings of Company stock at an average price of $101.28 per share, reaping $2,025,600 in proceeds.

- On April 22, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $85.54 per share, reaping $2,566,200 in proceeds.

- On April 23, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $85.24 per share, reaping $2,557,290 in proceeds.

- On May 20, 2021, Defendant Wolchko sold 20,000 shares of personal

holdings of Company stock at an average price of $77.17 per share, reaping $1,543,300 in proceeds.

- On July 22, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $86.16 per share, reaping $2,558,550 in proceeds.

- On August 19, 2021, Defendant Wolchko sold 20,000 shares of personal holdings of Company stock at an average price of $88.01 per share, reaping $1,760,200 in proceeds.

- On October 21, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $60.23 per share, reaping $1,806,750 in proceeds.

- On October 22, 2021, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $58.88 per share, reaping $1,766,400 in proceeds.

- On November 18, 2021, Defendant Wolchko sold 20,000 shares of personal holdings of Company stock at an average price of $54.27 per share, reaping $1,085,400 in proceeds.

- On January 10, 2022, Defendant Wolchko sold 34,156 shares of personal holdings of Company stock at an average price of $47.08 per share, reaping $1,608,166 in proceeds.

- On January 11, 2022, Defendant Wolchko sold 14,566 shares of personal holdings of Company stock at an average price of $48.78 per share, reaping $710,602 in proceeds.

- On January 20, 2022, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $40.21 per share, reaping $1,206,300 in proceeds.

- On January 21, 2022, Defendant Wolchko sold 10,000 shares of personal

holdings of Company stock at an average price of $38.02 per share, reaping $380,200 in proceeds.

- On April 21, 2022, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $36.23 per share, reaping $1,086,750 in proceeds.

- On April 22, 2022, Defendant Wolchko sold 10,000 shares of personal holdings of Company stock at an average price of $34.84 per share, reaping $348,450 in proceeds.

- On July 21, 2022, Defendant Wolchko sold 30,000 shares of personal holdings of Company stock at an average price of $32.80 per share, reaping $984,150 in proceeds.

- On July 22, 2022, Defendant Wolchko sold 6,246 shares of personal holdings of Company stock at an average price of $32.41 per share, reaping $202,414 in proceeds.

17.    Defendant Shefali Agarwal ("Agarwal") has served as a member of the Board of the Company since July 2019. According to the Company's public filings, Defendant Agarwal received $460,094 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Agarwal beneficially owned 66,717 shares of Fate common stock, worth $472,356. During the Relevant Period, Defendant Agarwal sold 1,648 shares of Company stock while in possession of material non-public information for proceeds of $36,808. While the price of Fate stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Agarwal made the following sales of Company stock:

- On June 3, 2022, Defendant Agarwal sold 807 shares of personal holdings of Company stock at an average price of $22.80 per share, reaping $18,399 in proceeds.

- On June 7, 2022, Defendant Agarwal sold 841 shares of personal

holdings of Company stock at an average price of $21.89 per share, reaping $18,409 in proceeds.

18.    Defendant Timothy P. Coughlin ("Coughlin") has served as a member of the Board of the Company since August 2013 and serves as chair of the Audit Committee. According to the Company's public filings, Defendant Coughlin received $464,094 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Coughlin beneficially owned 145,558 shares of Fate common stock, worth $1,030,550. On June 3, 2022, while in possession of material non-public information, Defendant Coughlin sold 1,439 shares of personal holdings of Company stock at an average price of $22.81 per share, reaping proceeds of $32,823.

19.    Defendant Robert S. Epstein ("Epstein") has served as a member of the Board of the Company since March 2014 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Epstein received $460,594 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Epstein beneficially owned 145,558 shares of Fate common stock, worth $1,030,550.

20.    Defendant Robert Hershberg ("Hershberg") has served as a member of the Board of the Company since May 2020. According to the Company's public filings, Defendant Hershberg received $454,094 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Hershberg beneficially owned 66,886 shares of Fate common stock, worth $473,552. On June 3, 2022, while in possession of material non-public information, Defendant Hershberg sold 672 shares of personal holdings of Company stock at an average price of $22.75 per share, reaping proceeds of $15,228.

21.    Defendant Karin Jooss ("Jooss") has served as a member of the Board of the Company since March 2019. According to the Company's public filings, Defendant Jooss received $455,094 in 2022 in compensation from the Company. As

of March 31, 2024, Defendant Jooss beneficially owned 82,075 shares of Fate common stock, worth $581,091. On June 3, 2022, while in possession of material non-public information, Defendant Jooss sold 1,483 shares of personal holdings of Company stock at an average price of $22.82 per share, reaping proceeds of $33,842.

22.     Defendant Michael Lee ("Lee") has served as a member of the Board of the Company since July 2018. According to the Company's public filings, Defendant Lee received $449,094 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Lee beneficially owned 83,558 shares of Fate common stock, worth $591,590.

23.     Defendant John Mendlein ("Mendlein") has served as a member of the Board of the Company since April 2008 and has served as Vice Chairman of the Board since 2011. According to the Company's public filings, Defendant Mendlein received $461,094 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Mendlein beneficially owned 445,458 shares of Fate common stock, worth $3,153,842. During the Relevant Period, Defendant Mendlein sold 32,926 shares of Company stock while in possession of material non-public information for proceeds of $1,139,069. While the price of Fate stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Mendlein made the following sales of Company stock:

- On March 10, 2022, Defendant Mendlein sold 31,562 shares of personal holdings of Company stock at an average price of $35.10 per share, reaping $1,107,984 in proceeds.

- On June 3, 2022, Defendant Mendlein sold 1,364 shares of personal holdings of Company stock at an average price of $22.79 per share, reaping $31,085 in proceeds.

24.     Defendant William Rastetter ("Rastetter") has served as Chairman of the Board of the Company since November 2012 and serves as a member of the Audit

Committee. According to the Company's public filings, Defendant Rastetter received $485,594 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Rastetter beneficially owned 751,651 shares of Fate common stock, worth $5,321,689.

25.    Defendant Yuan Xu ("Xu") has served as a member of the Board since August 2021. According to the Company's public filings, Defendant Xu received $452,627 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Xu beneficially owned 26,487 shares of Fate common stock, worth $187,527.

**_Officer Defendant_**

26.    Defendant Edward J. Dulac III ("Dulac") has served as CFO of Fate since August 2020. Defendant Dulac is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Dulac received $3,157,751 in 2022 and $2,824,498 in 2023 in compensation from the Company. As of March 31, 2024, Defendant Dulac beneficially owned 401,769 shares of Fate common stock, worth $2,844,524. During the Relevant Period, Defendant Dulac sold 45,816 shares of Company stock while in possession of material non-public information for proceeds of $2,724,784. While the price of Fate stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Dulac made the following sales of Company stock:

- On August 19, 2021, Defendant Dulac sold 3,474 shares of personal holdings of Company stock at an average price of $88.85 per share, reaping $308,664 in proceeds.

- On September 28, 2021, Defendant Dulac sold 19,460 shares of personal holdings of Company stock at an average price of $62.53 per share, reaping $1,216,833 in proceeds.

- On December 20, 2021, Defendant Dulac sold 15,977 shares of personal

holdings of Company stock at an average price of $60.00 per share, reaping $958,620 in proceeds.

- On January 11, 2022, Defendant Dulac sold 1,770 shares of personal holdings of Company stock at an average price of $48.70 per share, reaping $86,207 in proceeds.

- On August 18, 2022, Defendant Dulac sold 5,135 shares of personal holdings of Company stock at an average price of $30.08 per share, reaping $154,460 in proceeds.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

27.    By reason of their positions as officers and/or directors of Fate, and because of their ability to control the business and corporate affairs of Fate, the Individual Defendants owed Fate and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fate in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fate and its shareholders so as to benefit all shareholders equally.

28.    Each director and officer of the Company owes to Fate and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fate, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.    To discharge their duties, the officers and directors of Fate were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

31.    Each Individual Defendant, by virtue of his or her position as a director

and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fate, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

33.    To discharge their duties, the officers and directors of Fate were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Fate were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of

Delaware and the United States, and pursuant to Fate's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Fate conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Fate and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Fate's operations would comply with all applicable laws and Fate's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company

insiders at the expense of the Company; and

    (h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

34.    Each of the Individual Defendants further owed to Fate and the shareholders the duty of loyalty requiring that each favor Fate's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

35.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Fate and were at all times acting within the course and scope of such agency.

36.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Fate.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

37.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

38.    The purpose and effect of the conspiracy, common enterprise, and/or

common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

40.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Fate, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fate and at all times acted within the course and scope of such agency.

## **FATE'S CODE OF CONDUCT**

43.     Fate's Code of Conduct states that its purpose is to "aid the Company's directors, officers and employees in making ethical and legal decisions when conducting the Company's business and performing their day-to-day duties."

44.     Disciplinary measures for violations of the Code of Conduct may include "oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service, and restitution."

45.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

> The Company requires that all employees, officers and directors comply with all laws, rules and regulations applicable to the Company wherever it does business. You are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice when you are uncertain about them.
>
> If you become aware of the violation of any law, rule or regulation by the Company, whether by its officers, employees, directors, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the General Counsel. While it is the Company's desire to address matters internally, nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority.

46.     In a section titled "Corporate Opportunities," the Code of Conduct states that the Company's employees, officers and directors are prohibited from "using the Company's property or information or his or her position for improper personal gain."

47.     In a section titled "Accuracy of Records," the Code of Conduct states, in pertinent part:

> The integrity, reliability and accuracy in all material respects of the Company's books, records and financial statements is fundamental to the Company's continued and future business success. Company business records should always be prepared accurately and reliably. No director, officer or employee may cause the Company to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, officer or employee may create any false

or artificial documentation or book entry for any transaction entered into by the Company. Similarly, officers and employees who have responsibility for accounting and financial reporting matters have a responsibility to accurately record all funds, assets and transactions in all material respects on the Company's books and records.

48.     In a section titled "***Quality of Public Disclosures***," the Code of Conduct states:

> The Company is committed to providing its stockholders with complete and accurate information about its financial condition and results of operations as required by the securities laws of the United States. It is the Company's policy that the reports and documents it files with or submits to the Securities and Exchange Commission, and its earnings releases and similar public communications made by the Company, include fair, timely and understandable disclosure. Officers and employees who are responsible for these filings and disclosures, including the Company's principal executive, financial and accounting officers, must use reasonable judgment and perform their responsibilities honestly, ethically and objectively in order to ensure that this disclosure policy is fulfilled. The Company's senior management are primarily responsible for monitoring the Company's public disclosure.

## FATE'S AUDIT COMMITTEE CHARTER

49.     Pursuant to Fate's Audit Committee Charter, the purpose of the Audit Committee is to:

- [A]ssist the Board of Directors of the Company (the "Board") in its oversight of the integrity of the Company's financial statements, accounting and financial reporting processes of the Company and the audits of the Company's financial statements;

- [T]ake, or recommend that the Board take, appropriate action to oversee (i) the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors"), and (ii) the performance of the people responsible for the Company's internal audit function;

- [P]repare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's proxy statement for its annual meeting of stockholders; and

- [R]eview, assess and consider, in consultation with management and the Board, as appropriate, the Company's compliance with legal and regulatory requirements, and the overall risk management policies and procedures, including certain insurance policies or programs, of the Company.

50.     In a subsection titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter states:

- The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the Independent Auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee shall review:

  - any analyses prepared by management, the internal auditors, if any, and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Audit Committee may also consider other material written communications between the Independent Auditors and management, such as any management letter or schedule of

unadjusted differences;

- major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

- major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

- the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

51.    In the same subsection, the Audit Committee Charter continues, stating:

If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Senior Accounting Executive of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

52.    In a subsection titled "Unaudited Quarterly Financial Statements," the Audit Committee Charter states:

The Audit Committee shall discuss with management and the Independent Auditors, prior to the filing of the Company's Quarterly Reports on Form 10- Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the Independent Auditors pursuant to PCAOB AS 4105, and (3) any significant financial reporting issues that have arisen in connection with

the preparation of such financial statements.

53.    In a subsection titled "Quarterly Earnings Press Releases," the Audit Committee Charter states:

> The Audit Committee shall discuss the Company's quarterly financial or earnings press releases, as well as financial information and earnings or other guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

54.    In a subsection titled "Risk Assessment and Management," the Audit Committee Charter states:

- The Audit Committee shall evaluate and determine, or upon the request of the Board, recommend for determination by the Board, the achievement of milestones under any contractual arrangement with any third party pursuant to which any contingent right or obligation of the Company may be triggered; provided, that the foregoing shall not apply to the determination of achievement of any performance milestones for the purpose of equity award vesting or acceleration under any compensatory agreement with an employee, consultant or other individual service provider, which determinations shall remain within the scope of the authority of the Compensation Committee and the Board.

- The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

- In connection with the Audit Committee's discussion of the Company's financial, accounting and financial statement risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

- The Audit Committee shall periodically review and discuss with

management and the Board items of enterprise risk beyond financial risk and management of financial statements; including, but not limited to risks associated with financial, operational, privacy, security, cybersecurity, competition, legal, regulatory, hedging and accounting risk exposures. The Audit Committee may recommend on at least an annual basis, and more frequently as appropriate, enterprise risk items that should be brought to the Board for review and discussion of risk mitigation.

55.     In a subsection titled "Legal and Regulatory Compliance," the Audit Committee Charter states:

- The Audit Committee may discuss with management and the Independent Auditors, and review with the Board, the legal and regulatory requirements applicable to the Company and its subsidiaries and the Company's compliance with such requirements. After these discussions, the Audit Committee may, if it determines it to be appropriate, make recommendations to the Board with respect to the Company's policies and procedures for complying with legal and regulatory requirements.

- The Audit Committee may discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its policies and procedures for complying with legal and regulatory requirements.

- The Audit Committee shall exercise general oversight over management in connection with legal and regulatory requirements, both U.S. (federal and state) and foreign, applicable to the Company, and shall periodically evaluate the Company's policies and procedures to ensure the Company's compliance with changing regulatory requirements and foreign policy, including the adoption of domestic or foreign laws, regulations and interpretations that may affect the Company's business.

## SUBSTANTIVE ALLEGATIONS

### Background

56.     Fate is a biopharmaceutical company based in California that develops

cellular immunotherapies for cancer and immune disorders.

57.   On April 2, 2020, Fate issued a press release announcing that it had entered into the Collaboration Agreement with Janssen for cell-based cancer immunotherapies. Pursuant to the Collaboration Agreement, Fate would receive an upfront payment of $50 million and would be eligible to receive up to $3.0 billion upon the achievement of certain regulatory and commercial milestones. The Collaboration Agreement further provided that the Company could receive double-digit royalties from Janssen on any net sales of Fate products selected for clinical development. The press release stated, in pertinent part:

> Fate [. . .] announced today a global collaboration and option agreement with Janssen Biotech, Inc. (Janssen), one of the Janssen Pharmaceutical Companies of Johnson & Johnson.
>
> Under the multi-year collaboration agreement, Janssen will contribute proprietary antigen binding domains for up to four tumor-associated antigen targets. The Company will apply its iPSC product platform to research and preclinically develop new iPSC-derived chimeric antigen receptor (CAR) NK and CAR T-cell product candidates. The Company will receive $50 million in cash and $50 million from the purchase by Johnson & Johnson Innovation – JJDC, Inc. of newly issued shares of the Company's common stock at a price per share of $31.00. Janssen will also reimburse the Company for all activities conducted under the collaboration.
>
> "We are delighted to enter this strategic collaboration, which brings together Janssen's scientific and global commercialization leadership, deep domain expertise in oncology and proprietary technologies for targeting and binding certain tumors and our industry-leading iPSC product platform to develop novel off-the-shelf CAR NK and T-cell cancer immunotherapies," said Scott Wolchko, President and Chief Executive Officer of Fate Therapeutics. "The collaboration strengthens our financial and operating position through a focused effort of developing cell-based cancer immunotherapies utilizing Janssen's proprietary antigen binding domains, while enabling us to continue to exploit our deep pipeline of wholly-owned product candidates and

further develop our off-the-shelf, iPSC-derived cell-based immunotherapies."

The Company will advance candidates under the collaboration to the filing of an Investigational New Drug (IND) application, after which Janssen will have the right to exercise its option for an exclusive license for the development and commercialization of collaboration candidates targeting the tumor-associated antigens. The Company will be primarily responsible for the manufacture of collaboration candidates, the cost of which will be paid for by Janssen. The Company is eligible to receive payments of up to $1.8 billion upon the achievement of development and regulatory milestones and up to $1.2 billion upon the achievement of commercial milestones, plus double-digit royalties on worldwide commercial sales of products targeting the antigens. In addition, the Company has the right to elect to co-commercialize each collaboration candidate in the U.S. and share equally in profits and losses in the U.S., subject to its payment of certain clinical development costs and adjustments in milestone and royalty payments.

### The Individual Defendants' False and Misleading Statements

58.    On May 11, 2020, the Company issued a press release revealing its financial results for the first quarter of 2020. The press release stated:

"*[W]e entered into a transformative collaboration with Janssen* that leverages our iPSC product platform and Janssen's proprietary tumor-targeting antigen binders to develop novel CAR NK and CAR T-Cell product candidates for hematologic malignancies and solid tumors, supporting our fundamental goal of bringing off-the-shelf, iPSC-derived cell-based cancer immunotherapies to patients."[2]

59.    During a conference call with investors and analysts held the same day, Defendant Wolchko stated:

Finally, I'd like to make a few comments about our newly formed collaboration with Janssen. *The partnership is transformative for us. And I believe it significantly increases our ability to invest in innovation, build commercial-scale iPSC manufacturing operations,*

---

[2] Unless indicated otherwise, all emphasis is added in this Complaint.

***bring best-in-class iPS-derived cell-based cancer immunotherapies to patients and deliver value to shareholders***. The collaboration brings together Janssen's scientific leadership in deep domain expertise in oncology and our industry-leading iPSC product platform. Our mutual objective is to research, develop and commercialize novel off-the-shelf iPS-derived CAR NK and CAR-T cell products.

60.     On August 5, 2020, the Company issued a press release revealing its financial results for the second quarter of 2020. The press release stated: "We successfully launched our Janssen collaboration with strong momentum, bringing together Janssen's proprietary tumor-targeting antigen binders and our industry-leading iPSC product platform to develop novel off-the-shelf CAR NK and CAR T-cell immunotherapies for hematologic malignancies and solid tumors."

61.     The same day, the Company hosted an earnings call to discuss its second quarter 2020 financial results with analysts and investors. During the call, Defendant Wolchko stated:

> And we're informing and launching a transformative partnership with Janssen, bringing together our industry-leading iPSC product platform with Janssen's proprietary tumor targeting antigen binders to develop novel off-the-shelf CAR NK and CAR T-cell immunotherapies for both hematologic malignancies and solid tumors.
>
> * * *
>
> We are also leveraging our unique ability to build multiplexed engineered cell products of increasing complexity, using already established clonal master engineered iPSC lines with our collaboration partners, including under our newly formed collaboration with Janssen, which brings together Janssen's deep domain expertise in oncology and our industry-leading iPSC cell product platform.
>
> We have successfully launched this collaboration with strong momentum. Janssen has already contributed proprietary antigen-binding domains against one hematologic malignancy target and one solid tumor target, for which we are building novel CAR constructs. As a first step, we are incorporating these constructs into existing multiplex engineered master iPSC cell lines, which may enable an efficient and accelerated

pathway to clinical development for the collaboration's initial product candidates.

62.    Specifically with respect to the Company's second quarter 2020 financial results, Defendant Wolchko stated:

> Turning to our financial results. Revenue was $5.5 million for the second quarter of 2020 compared to $2.8 million for the same period last year. Revenue in the current quarter was derived from our collaboration with Janssen and ONO Pharmaceutical.

63.    On November 5, 2020, the Company issued a press release announcing its financial results for the third quarter of 2020. The press release stated that "[r]evenue was $7.6 million for the third quarter of 2020, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical."

64.    On February 24, 2021, Fate filed its 2020 annual report on Form 10-K with the SEC (the "2020 10-K"), which was signed by Defendants Wolchko, Dulac, Rastetter, Mendlein, Agarwal, Coughlin, Epstein, Hershberg, Jooss, and Lee. With respect to the Company's strategy, the 2020 10-K stated:

> Selectively share our iPSC product platform with industry-leading strategic partners for the development of iPSC-derived cell therapies. The research, development and clinical investigation of cell therapies for the treatment of human diseases is rapidly expanding. We believe we are uniquely positioned as an expert partner of choice for industry-leading developers seeking to develop iPSC-derived cell therapies for the treatment of human diseases, including cancer. For example, we are collaborating with Ono Pharmaceutical Co. Ltd. (Ono) to develop and commercialize off-the-shelf, iPSC-derived CAR T-cells for the treatment of certain solid tumors, and we are collaborating with Janssen Biotech, Inc. (Janssen), part of the Janssen Pharmaceutical Companies of Johnson & Johnson, to develop and commercialize off-the-shelf, iPSC-derived CAR NK cell and CAR T-cell product candidates for the treatment of certain hematologic malignancies and solid tumors. Since iPSCs have the unique capacity to be genetically engineered, indefinitely expanded and differentiated in culture into any type of cell in the body, we believe there is significant opportunity to broadly exploit our industry-leading iPSC

product platform and intellectual property position in other disease areas beyond cancer. We will continue to seek partnerships with institutions and companies for the research, development and commercialization of iPSC-derived cell therapies for the treatment of human diseases.

65.     The same day, in a press release announcing Fate's fourth quarter and 2020 Fiscal Year financial results, the Company stated:

"2020 was a pivotal year for Fate Therapeutics. We demonstrated the clinical safety and therapeutic activity of engineered iPSC-derived NK cell therapy as patients with relapsed / refractory lymphoma achieved objective responses across our FT516 and FT596 Phase 1 studies. We successfully worked with the FDA to enable clinical investigation of FT538, the first-ever CRISPR-edited, iPSC-derived cell therapy, and FT576, the first-ever cell therapy engineered with four functional anti-tumor modalities, in patients with multiple myeloma. We also made strong progress with our strategic partners, Ono Pharmaceutical and Janssen, in leveraging the unique advantages of our iPSC product platform to advance multiplexed-engineered CAR NK and CAR T-cell product candidates toward clinical development for solid tumors," said Scott Wolchko, President and Chief Executive Officer of Fate Therapeutics. "We look forward to a promising 2021 where we expect to have clinical read-outs across our programs, treat patients with the first-ever iPSC-derived CAR T-cell therapy, submit IND applications for two iPSC-derived CAR NK cell programs targeting novel antigens in solid tumors, and open our second cGMP manufacturing facility for an additional 40,000 square feet of capacity."

* * *

Total Revenue: Revenue was $15.9 million for the fourth quarter of 2020, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical.

66.     Also on February 24, 2021, the Company hosted an earnings call to discuss its financial results for the fourth quarter of 2020 with analysts and investors. During the call, Defendant Wolchko stated:

We also continued to innovate and optimize our manufacturing process, including under our collaborations with ONO and Janssen and we have

initiated a second GMP manufacturing run of FT819 to implement certain improvements. We expect to treat the first patients with FT819 in the middle of 2021.

* * *

And finally, we believe our iPSC product platform represents the ideal framework for designing and developing multiplex engineered CAR NK cell product candidates. And we currently have four novel IPS derived CAR NK cell programs for solid tumors undergoing preclinical development. These programs include three wholly-owned programs and one program under our collaboration with Janssen.

67.    On April 21, 2021, the Company filed a proxy statement with the SEC, soliciting shareholder approval for, inter alia, the election of Defendants Hershberg, Rastetter, and Lee (the "2021 Proxy Statement"). Regarding risk oversight, the 2021 Proxy Statement stated:

Risk is inherent with every business, and how well a business manages risk can ultimately determine its success. We face a number of risks, including risks relating to our financial condition, development and commercialization activities, operations and intellectual property. Management is responsible for the day-to-day management of risks we face, while our Board of Directors, as a whole and through its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board of Directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as designed.

The role of our Board of Directors in overseeing the management of our risks is conducted primarily through committees of the Board of Directors, as disclosed in the descriptions of each of the committees below and in the charters of each of the committees. The full Board of Directors (or the appropriate board committee in the case of risks that are under the purview of a particular committee) discusses with management our major risk exposures, their potential impact on our company, and the steps we take to manage them. When a board committee is responsible for evaluating and overseeing the management of a particular risk or risks, the chairman of the relevant committee reports on the discussion to

the full Board of Directors during the committee reports portion of the next board meeting. This enables our Board of Directors and its committees to coordinate the risk oversight role, particularly with respect to risk interrelationships.

68.    On May 5, 2021, the Company issued a press release announcing its financial results for the first quarter of 2021 which stated that "[r]evenue was $11.1 million for the first quarter of 2021, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical."

69.    On August 4, 2021, the Company issued a press release announcing its financial results for the second quarter of 2021 which stated the following:

Preclinical Milestone Reached for First Product Candidate under Janssen Collaboration. In June, the Company and Janssen elected to initiate IND-enabling activities for an iPSC-derived CAR NK cell product candidate incorporating a Janssen proprietary antigen binding domain that targets an antigen expressed on certain solid tumors, triggering the payment of a milestone fee to the Company from Janssen under the collaboration. Janssen maintains an option to develop and commercialize the iPSC-derived CAR NK cell product candidate in all territories of the world, with the Company retaining the option to co-commercialize the product candidate in the United States.

* * *

Total Revenue: Revenue was $13.4 million for the second quarter of 2021, which was derived from the Company's collaborations with Janssen and Ono Pharmaceutical.

70.    On November 4, 2021, during a conference call with analysts and investors regarding the Company's financial results for the third quarter of 2020, Defendant Wolchko stated the following, in response to a question regarding the status of the Janssen collaboration:

So I mean the Janssen collaboration has continued to go very well. And obviously, as you can tell from the revenue that continues to increase, we continue to increase the resources under the collaboration. I think we've

disclosed in the past that the collaboration started with 2 antigen targets, 1 in hematologic malignancies, 1 in solid tumors. A third antigen target has now been added to the collaboration, and Janssen reserves the right to add a fourth target to the collaboration. So collaboration is moving forward, we're really pleased with it. I think we'll be able to get a – give a little bit of visibility on the first product candidate at the solid tumor day, although we may not be able to disclose the target quite yet.

71.    On February 28, 2022, the Company hosted a conference call to discuss its financial results for the fourth quarter of 2021 with analysts and investors. During the call, Defendant Wolchko highlighted candidates under the Collaboration Agreement, stating: "[W]e are also developing multiplexed-engineered CAR NK and CAR T-cell product candidates for solid tumors, alongside our 2 partners, Janssen and Ono."

72.    Also on February 28, 2022, the Company filed its 2021 annual report on Form 10-K with the SEC (the "2021 10-K"), signed by Defendants Wolchko, Dulac, Rastetter, Mendlein, Agarwal, Coughlin, Epstein, Hershberg, Jooss, Lee, and Xu. The 2021 10-K touted the Company's approach to cell-based cancer immunotherapy research:

Cell-based cancer immunotherapies undergoing clinical investigation today most often rely on the use of autologous, or a patient's own, cells. The requirement to source, engineer, expand and deliver cells patient-by-patient is logistically complex, resource intensive and expensive, and can result in significant batch-to-batch variability in product identity, purity and potency as well as in manufacturing failures. Significant hurdles remain to ensure that cell-based cancer immunotherapies can be consistently manufactured and reliably delivered, in a cost-effective manner and at the scale necessary, to support broad patient access and wide-spread commercialization.

Rather than rely on the use of a patient's own cells, we seek to use clonal master iPSC lines to manufacture, develop and commercialize first-in-class cellular immunotherapies. We believe our approach has the potential to improve cell product consistency and potency, reduce manufacturing costs, shorten time to treatment and reach more patients.

73.     On March 16, 2022, at the Barclays Global Healthcare Conference, Defendant Dulac highlighted the Collaboration Agreement:

> We do benefit from 2 collaborations. [A]nd then Janssen, just to remind everyone, it's a pretty big collaboration for us. We have 4 different targets, solid and liquid tumors, can be NK or T cells. Those programs are going very, very well. J&J has already selected the first 3 targets. We have – we're not able to disclose those yet, and they're working on the fourth target, and we've been accelerating that work. So that collaboration is 2 years in. It's going really, really well. And we expect to file at least the first IND for the [first] program for J&J by the end of the year. It's important from an innovation perspective. We really value our partners. We could choose to do more such collaborations, but I also think what's on the table are potentially larger strategic collaborations. We're at that point where at the end of the Phase I study, where we have a derisked profile for lymphoma and then to myeloma that aligns really well with what larger biopharma companies look more on what they do well, right? We can take it through Phase I. They can be a great partner to help broaden the development program move very, very quickly and then commercializing the footprint that a very small up-and-coming company like ours cannot do. So I think there's multiple levers to consider around that. The collaborations are on the forefront of our minds, and we're constantly talking to existing parties and trying to see what might be possible.

74.     On May 4, 2022, the Company hosted a conference call to discuss its financial results for the first quarter of 2022 with investors and analysts. During the call, Defendant Wolchko stated:

> Turning to our collaborations with Janssen and Ono. We continue to show strong momentum in bringing multiplexed-engineered iPS-derived CAR NK and CAR T cell product candidates to patients for the treatment of hematologic malignancies and solid tumors. Under our collaboration with Janssen, we have now initiated IND-enabling activities for 2 iPS-derived CAR NK cell collaboration candidates. And we are actively working together with Janssen to prepare and submit IND applications for both of these candidates.

> For each of these collaboration candidates, Janssen maintains the option subject to its payment of an option fee prior to IND submission to initiate worldwide clinical development. We maintain the right in the U.S. alongside Janssen to co-commercialize and share equally in profits and losses of each collaboration candidate. As a reminder, under our

collaboration, Janssen has the right to designate and contribute novel binding domains targeting up to 4 tumor-associated antigens. Janssen has now designated and contributed novel binding domains targeting 3 antigens. And we have now successfully achieved preclinical milestones for collaboration candidates targeting all 3 antigens.

75.    On August 3, 2022, the Company hosted a conference call to discuss its financial results for the second quarter of 2022 with investors and analysts. During that call, Defendant Wolchko stated:

We maintain an opt-in right to co-commercialize and share equally in profits and losses of collaboration products in the U.S. under each antigen program. In May, Janssen exercised its option on a first antigen program, triggering a $10 million payment to fee, and we have now advanced a second antigen program to the stage of option exercise decision. We are currently working with Janssen to prepare and submit 2 IND applications: one for each of these 2 antigen programs for off-the-shelf iPS-derived CAR NK cell collaboration products.

76.    On September 12, 2022, at the Morgan Stanley Global Healthcare Conference, Defendant Wolchko again touted the Collaboration Agreement:

Obviously, the third channel of conversation is around the clinical data that we're generating. And then importantly, we have a collaboration with J&J and in that collaboration with J&J, we have 4 targets that are under that collaboration. 2 are in hematologic malignancies, 2 are in solid tumors. With the J&J, the 2 hematologic malignancy candidates, we expect to file an IND this year on the first one and early next year on the second one.

77.    On November 2, 2022, the Company hosted a conference call to discuss its financial results for the third quarter of 2022 with investors and analysts. During the call, Defendant Wolchko stated:

The second CAR T-cell product candidate, FT862, is partnered with Janssen and targets KLK2, an antigen with prostate-restricted expression that is maintained during prostate cancer progression. Preclinical data generated under our collaboration with Janssen demonstrated that multiplexed-engineered iPS-derived CAR T-cells targeting KLK2 have

the potential to effectively infiltrate tumor mass and eliminate tumor cells in a highly selective manner and to prolong survival in xenograft models of prostate cancer. As a reminder, Janssen funds all preclinical development of the FT862 program, and has the right to exercise an exclusive option to conduct worldwide clinical development and commercialization, and we maintain the right to co-commercialize and share equally in profits and losses of FT862 in the US.

78.    The above statements identified in ¶¶ 58-77 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Fate was unable to replicate results it had achieved in its research and development phase in a clinical setting; (ii) as a result, the Company could not reasonably expect to earn several of the milestone payments and royalty payments covered by the Collaboration Agreement; (iii) accordingly, the Collaboration Agreement was considerably less viable than the Company had represented to the public.

***The Truth Emerges***

79.    On January 5, 2023, the Company issued a press release announcing the termination of the Collaboration Agreement. Specifically, the press release stated:

Fate [. . .] announced today that it has declined a proposal from Janssen Biotech, Inc. ("Janssen") for continuation of the collaboration and option agreement between the parties on revised terms and conditions and, as a result, the agreement has been terminated and all collaboration activities will be wound down in the first quarter of 2023. In addition, the Company has completed a strategic review of its natural killer (NK) cell product pipeline and has elected to focus on advancing its most innovative and differentiated programs, which have a multiplexed-engineered cellular framework of novel synthetic controls designed to promote multi-antigen targeting, increase potency, extend functional persistence, and enable patient dosing with reduced conditioning chemotherapy. The Company ended the fourth quarter with approximately $475 million in cash, cash equivalents, and receivables and, based on its pipeline prioritization and expense reduction, the Company expects to have sufficient financial resources through the end of 2025 to capitalize on its iPSC-derived chimeric antigen receptor (CAR) NK and CAR T-cell programs.

"We are disappointed that we were not able to align with Janssen on their proposal for continuation of our collaboration, where two product candidates targeting high-value, clinically-validated hematology antigens were set to enter clinical development in 2023," said Scott Wolchko, President and Chief Executive Officer of Fate Therapeutics. "As a consequence, in keeping with the Company's commitment to develop disruptive product candidates, programs and technologies with the potential to address large, unmet clinical needs, we have prioritized our clinical programs and substantially reduced operating expenses, including taking the difficult and painful step of reducing our workforce, to ensure that we have a three-year cash runway. We are greatly saddened to move in this direction as our employees have continually demonstrated the highest level of dedication and commitment in pioneering iPSC-derived cell therapy for patients with cancer. I want to extend my deepest appreciation to all of our employees for their tremendous efforts and wish those employees who will be departing great success in the future."

* * *

***Wind Down of Janssen Collaboration***

During the fourth quarter of 2022, the FDA allowed an IND application for a first collaboration product for the treatment of B-cell lymphoma, for which the Company expects to receive a $3 million milestone payment, and Janssen exercised its second commercial option for a collaboration product, for which the Company expects to receive a $10 million milestone payment. As a result of the collaboration's termination, during the first quarter of 2023, the Company will wind down its activities with Janssen, including discontinuing development of all collaboration products, at the expense of Janssen. As a result of such termination, all licenses and other rights granted pursuant to the agreement terminate; neither party has any right to continue to develop, manufacture or commercialize any collaboration product or use the other party's materials; and neither party is restricted from independently developing, manufacturing, or commercializing any product, including any product directed to any antigen targeted by a collaboration product.

80.     On this news, the price of Fate's common stock declined a staggering 61.45% in one day, from a closing price of $11.00 per share on January 5, 2023 to a closing price of $4.24 on January 6, 2023.

*Insider Sales*

81.    During the Relevant Period, Defendants Wolchko, Agarwal, Coughlin, Hershberg, Jooss, Mendlein, and Dulac (the "Insider Trading Defendants") each made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

82.    The Insider Trading Defendants collectively reaped millions of dollars in profits selling their personal holdings of Company stock at prices as high as $116.33, more than ***2500%*** of the stock's closing price of $4.24 after the corrective disclosures.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

83.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

84.    Fate is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

85.    Plaintiff is a current shareholder of Fate and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

86.    A pre-suit demand on the Board of Fate is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Wolchko, Rastetter, Mendlein, Coughlin, Epstein, Hershberg, Lee, Jooss, Agarwal, and Xu (the "Director Defendants"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including

because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

87.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

88.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

89.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

90.    Defendants Coughlin, Rastetter, and Epstein serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

91.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

92.     All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

93.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

94.     The acts complained of herein constitute violations of fiduciary duties owed by Fate's officers and directors, and these acts are incapable of ratification.

95.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein

by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Fate. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Fate, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

96.   If there is no directors' and officers' liability insurance, then the directors will not cause Fate to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

97.   Thus, for all of the reasons set forth above, all seven, or if not all, then at least five of Fate's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for
### Violations of § 14(a) of the Exchange Act and Rule 14a-9

98.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.   The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder

by the SEC.

100.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the Company's proxy statement filed with the SEC on April 21, 2021 (the "Proxy Statement"). The Proxy Statement incorporated by reference the Company's annual report for the year ended December 31, 2020, filed with the SEC on Form 10-K on February 24, 2021. As alleged above, the 2020 10-K contained materially false and misleading statements concerning the Company's collaboration with Janssen concerning the Company's iPSC-derived CAR NK cell and CAR T-cell product candidates for the treatment of certain hematologic malignancies and solid tumors.

101.   The Proxy Statement was used to solicit shareholder votes in connection with the advisory vote to approve the compensation of Defendants Wolchko and Dulac, as well as the Company's Chief Research and Development Officer, Dr. Bahram Valamehr, and Cindy R. Tahl, Fate's General Counsel and Corporate Secretary. While the shareholder vote was non-binding, the Proxy Statement indicated that "there is any significant vote against our named executive officer compensation as disclosed in this proxy statement, our Compensation Committee will evaluate whether any actions are necessary to address the concerns of stockholders."

102.   Describing the Company's "compensation philosophy and determination process," the Proxy Statement indicated that the compensation is performance based: "Our Board believes our compensation program should align executive interests with the drivers of growth and stockholder returns, and support achievement of the company's key business mission, goals, and objectives."

103.   The incorporation by reference of the materially false and misleading statements in the 2020 10-K, which touted the Company's collaboration with Janssen, therefore misleadingly induced shareholders to vote in favor performance-based compensation to which the above-named executives, including Defendants  Wolchko

and Dulac, to which they were not entitled.

104.   The payment of unwarranted performance-based compensation to these Company executives was, therefore, a waste of corporate assets.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

105.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.   The Individual Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

107.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

108.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

109.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

110.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes,

among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

### COUNT III

**Against the Insider Trading Defendants**
**For Breach of Fiduciary Duties (*Brophy* Claim)**

111.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.   During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects.  Notwithstanding their duty to refrain from trading in Fate common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

113.   The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

114.   The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Fate stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  The Insider Trading Defendants' sales of stock while in possession and control of this material,

adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

115.   Plaintiff, on behalf of Fate, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

116.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

118.   Plaintiff on behalf of Fate has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

119.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Fate.

121.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from

Fate that were tied to the performance or artificially inflated valuation of Fate, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

122.   The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

123.   Plaintiff, as a shareholder and a representative of Fate, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

124.   Plaintiff on behalf of Fate has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Abuse of Control

125.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.   The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

127.   As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

128.   Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

129.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the

1 | Company.

2 | 131.   As a result of the misconduct described above, the Individual Defendants

3 | wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation

4 | and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or

5 | legal costs, including defending the Company and its officers against the Securities

6 | Class Action.

7 | 132.   As a result of the waste of corporate assets, the Individual Defendants are

8 | liable to the Company.

9 | 133.   Plaintiff on behalf Fate has no adequate remedy at law.

10 | **PRAYER FOR RELIEF**

11 | WHEREFORE, Plaintiff demands judgment as follows:

12 | A.   Awarding money damages against all Individual Defendants, jointly and

13 | severally, for all losses and damages suffered as a result of the acts and transactions

14 | complained of herein, together with pre-judgment interest, molded in a fashion to

15 | ensure the Individual Defendants do not participate therein or benefit thereby;

16 | B.   Directing all Individual Defendants to account for all damages caused by

17 | them and all profits and special benefits and unjust enrichment they have obtained as

18 | a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards,

19 | options and common stock sale proceeds, and imposing a constructive trust thereon;

20 | C.   Awarding punitive damages;

21 | D.   Awarding costs and disbursements of this action, including reasonable

22 | attorneys' fees, accountants' and experts' fees, costs, and expenses; and

23 | E.   Granting such other and further relief as the Court deems just and proper.

24 | ///

25 | ///

26 | ///

27 | ///

28 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

DATED: June 12, 2024

_/s/ Rachele R. Byrd_
RACHELE R. BYRD

BETSY C. MANIFOLD
_manifold@whafh.com_
RACHELE R. BYRD
_byrd@whafh.com_
ALEX J. TRAMONTANO
_tramontano@whafh.com_
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile:  (619) 234-4599

SETH D. RIGRODSKY
_sdr@rl-legal.com_
TIMOTHY J. MACFALL
_tjm@rl-legal.com_
SAMIR AOUGAB
_sa@rl-legal.com_
**RIGRODSKY LAW, P.A.**
825 East Gate Boulevard,
Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516

DocuSign Envelope ID: 945ABB3D-749D-4972-8D75-A14B84FE9BCA

## <u>VERIFICATION</u>

I, Angela Horrobin, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint brought on behalf of Fate Therapeutics, Inc., know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/2/2024 _____

DocuSigned by:

8EBA7933942146F...

ANGELA HORROBIN